NORMAN F. DACEY *v.* CONNECTICUT BAR ASSOCIATION

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

Argued December 2, 1975—decision released April 6, 1976

*Bernard S. Peck,* with whom were *Daniel D. Peck* and *Richard A. Johnson,* for the appellant (defendant).

*Sturges N. Laros,* with whom was *James G. Englis,* for the appellee (plaintiff).

LOISELLE, J. The plaintiff, Norman F. Dacey, published a book entitled "How to Avoid Probate!" Subsequent to the publishing of this book, the defendant, the Connecticut Bar Association, published a pamphlet entitled "Understanding Probate! or Don't be Dead—Wrong!" The plaintiff contended that some of the statements in this pamphlet were libelous and he brought an action in libel against the defendant. The jury awarded $60,000 general damages in favor of the plaintiff and the defendant has appealed.

At the outset, the plaintiff has challenged the propriety of this court's determining the appeal. Every justice of this court is a member of the defendant association. The plaintiff's counsel does not claim personal bias on the part of any member of this court but claims that the appearance of impropriety is in issue. Further, the plaintiff suggests that the impartiality of the members of this court has been and will be questioned.

The plaintiff cites General Statutes § 51-39[1] and

---

[1] "[General Statutes] Sec. 51-39. DISQUALIFICATION BY RELATIONSHIP OR INTEREST. JUDGE MAY ACT WITH CONSENT OF PARTIES. When there is so near a relationship between any judge and any party in any proceeding in court before him, as between father and son, brothers or uncle and nephew, by nature or marriage, or landlord and tenant; or when any judge may be liable to contribute to the damages, costs or expenses of any such proceeding, or when he may receive a direct pecuniary benefit by the determination thereof, he shall be disqualified to act, except as herein provided. No judge shall be disqualified to act in any proceeding by reason of his being

Canons 1, 2 and 3 of the Code of Judicial Conduct[2] and argues that the special resolution passed by the defendant whereby any judge or justice who may participate in the case is exempt from the payment of any judgment rendered against the defendant is, in fact, an admission by the defendant that the members of this court have a pecuniary interest in the outcome of this appeal.

A challenge on the basis of disqualification of a judge or justice is not one which can be considered lightly. This state early has taken the view that any judge having an interest in a pending case should disqualify himself from hearing the case. *Wood* v. *Hartford Fire Ins. Co.,* 13 Conn. 202, 211; see also *Nettleton's Appeal,* 28 Conn. 268; *Cabot Bank's Appeal,* 26 Conn. 7.

In the event that the plaintiff should prevail in this appeal, the defendant has voted that the dues of each justice would be reduced so that none of the justices would contribute to the payment of the judgment. Whether this is done or not, the pecuniary interest of each justice is de minimis and is comparable to the interest of the judge that determines the tax appeal of a litigant against a town

---

a member of any ecclesiastical corporation, unless it is a party to the action, nor in any proceeding in which any town, city or borough is a party or interested, by reason of his being an inhabitant thereof or liable to taxation therein or by reason of his being related to any taxpayer or inhabitant thereof. When any judge is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court."

[2] "CODE OF JUDICIAL CONDUCT

Canon 1. A Judge should uphold the integrity and independence of the judiciary.

Canon 2. A Judge should avoid impropriety and the appearance of impropriety in all his activities.

Canon 3. A Judge should perform the duties of his office impartially and diligently."

where the judge is a taxpayer. We fail to see any conflict concerning the nonfinancial interests. Furthermore, it has been held that membership in a bar association or integrated bar is not a basis for disqualification in a case in which a bar association is a party. *Minnesota State Bar Assn.* v. *Divorce Education Associates,* 300 Minn. 323, 219 N.W.2d 920, cert. denied, sub nom. *Thibodeau* v. *Minnesota State Bar Assn.,* 419 U.S. 1023, 95 S. Ct. 500, 42 L. Ed. 2d 297; *In re Rhodes,* 370 F.2d 411, cert. denied, 386 U.S. 999, 87 S. Ct. 1321, 18 L. Ed. 2d 349; see 46 Am. Jur. 2d, Judges, § 121.

During oral argument when the plaintiff's counsel was told that a full court could not be formed from among the total membership of this court and the Superior Court who were not members of the defendant, counsel suggested that this court find the issues for the plaintiff and let the defendant attempt to obtain certiorari from the United States Supreme Court.

Article fifth, § 1, of the state constitution vests the judicial power of the state in the courts. The Supreme Court exercises appellate jurisdiction as defined by law. This judicial responsibility is an attribute of sovereignty. There is a limitation upon the right or duty of judges to disqualify themselves. "Disqualification must yield to necessity where to disqualify would destroy the only tribunal in which relief could be had and thus preclude determination of the issue. In such case it has been held, consistently, the court must act no matter how disagreeable its task may be." *New Jersey State Bar Assn.* v. *New Jersey Assn. of Realtor Boards,* 118 N.J. Super. 203, 209, 287 A.2d 14; see *Evans* v. *Gore,* 253 U.S. 245, 247–48, 40 S. Ct. 550, 64 L. Ed. 887;

*Moulton* v. *Byrd,* 224 Ala. 403, 405, 140 So. 384; *Federal Construction Co.* v. *Curd,* 179 Cal. 489, 493–94, 177 P. 469; *Wheeler* v. *Board of Trustees,* 200 Ga. 323, 326–28, 37 S.E.2d 322; *Long* v. *Watts,* 183 N.C. 99, 102, 110 S.E. 765; *First American Bank & Trust Co.* v. *Ellwein,* 221 N.W.2d 509, 515–16 (N.D.), cert. denied, 419 U.S. 1026, 95 S. Ct. 505, 42 L. Ed. 2d 301; *Alamo Title Co.* v. *San Antonio Bar Assn.,* 360 S.W.2d 814, 817 (Tex. Civ. App.) (application for writ of error refused, no reversible error); see also 46 Am. Jur. 2d, Judges, § 89.

The defendant is entitled by law to appeal to this court. General Statutes § 52-263. There is no other appellate tribunal to which, under the law, the defendant can appeal. It was sued and a verdict was rendered against it. It brought the appeal in due course. Both parties have orally argued the appeal and both have submitted extensive briefs. In this situation, the only course open to us is to consider the arguments and decide the appeal. See *Evans* v. *Gore,* supra.

The defendant claims the court erred in certain rulings on evidence, in its refusal to charge as requested, in its charge to the jury and in not setting aside the verdict and rendering judgment notwithstanding the verdict.

The plaintiff's claims of proof include the following: In 1965 the plaintiff, a financial consultant, trustee, writer and lecturer on various estate planning subjects, wrote and published a book entitled "How to Avoid Probate!" hereinafter referred to as the plaintiff's book. Approximately one million copies of this book have been sold. The plaintiff has written two other books, one prior and one sub-

sequent to the book in question. He has also written numerous newspaper and magazine articles and has lectured on estate planning.

In the plaintiff's book he wrote on page 11: "Most estate planners recommend joint ownership of the family home but caution against similar holding of other property. Many people have joint checking or savings accounts in banks. It is not uncommon for banks to block such accounts upon the death of one of the co-owners. It would be a good idea for the survivor to go to the bank promptly, withdraw the money and transfer it to a new account in his or her name. Ask your bank to write you a letter stating what its policy is in this respect, so you'll be forewarned. In some states, safe deposit boxes of deceased persons can be opened only by a representative of the probate court or a state inheritance tax appraiser. In Illinois, such state appraisers were accused of looting deposit boxes of $40,000 in cash and securities over a period of only a few months. In states having such requirements on safe deposit boxes, it may be desirable for husband and wife to have two boxes. His property is deposited in her box and her property in his box. Under this arrangement when the deceased husband's deposit box is opened, no property belonging to him is to be found—it's all in his wife's box, to which she has ready, unquestioned access."

After the publication of his book, the plaintiff became aware of the publication of a pamphlet by the defendant entitled "Understanding Probate! or Don't be Dead—Wrong!" hereinafter referred to as the defendant's pamphlet. On page 11 of the pamphlet it states: "Mr. Dacey suggests that husband and wife have separate safe deposit boxes and

that the husband's valuables be placed in the wife's box and vice versa, presumably to defraud the Internal Revenue Service and the State Tax Department of death taxes on such valuables." On page 17 of the pamphlet it states: "The worst that could happen to the Dacey believer is a term in jail. Some of Dacey's recommendations regarding joint accounts, safe deposit boxes, and certificates of title which lead to a failure to disclose assets could be fraudulent as to creditors, the state and Uncle Sam." A retraction was demanded and refused. The plaintiff's book discusses the payment of taxes and he has always advocated the payment of taxes and has not advocated the nonpayment of taxes. There is nothing in the plaintiff's book about the nondisclosure of assets. In 1966, the three members of the committee appointed by the defendant's president to draft the pamphlet were specialists in the field of probate. Three drafts of the pamphlet were submitted to the council of the defendant and it was finally decided to refer specifically to the plaintiff and his book. The president of the defendant, among others, approved the final draft of the pamphlet and a press conference was called at the president's law office to publicize the publication of the defendant's pamphlet. Included in the statement to the press was the president's statement: "The worst that could happen to a Dacey believer is a term in jail." Copies were to be sent to the defendant's 3500 members, banks, book publishing companies and anyone who requested one. There were approximately 175 to 200 requests for the defendant's pamphlet, 100 from this state and the remainder from 16 other states.

Subsequent to the publication of the defendant's pamphlet there was an increasing chill on the plain-

tiff's opportunity to lecture, a reduced interest on the part of editors in the material the plaintiff was writing and a decreasing number of persons who requested consultations. Prior to the publication of the defendant's pamphlet the plaintiff would give from 35 to 50 lectures a year. In the year before the trial he gave two lectures. There has been a substantial decrease in the number of requests for articles and his business as a financial consultant diminished to a point that at the time of trial it no longer existed. There is nothing illegal with a husband and wife having a joint safe deposit box, a joint bank account or having real property in survivorship. The plaintiff's book was neither misleading nor did it exploit the public or lead its members astray.

The defendant's claims of proof include the following: The defendant is a voluntary association of practicing lawyers dedicated to public service. Following the publication of the plaintiff's book there was an increasing number of inquiries and complaints about it brought to the attention of the council which conducts the business of the defendant between meetings of its board of delegates and its full membership. The inquiries indicated that the public was confused or could be confused about certain aspects of the plaintiff's book. The defendant considered it significant in interpreting the plaintiff's book that the advice in the plaintiff's book which the defendant considered particularly misleading was in a book entitled "How to Avoid Probate!" and in chapters containing the words "Avoiding Probate." It was the defendant's interpretation that the plaintiff's book advocated the nondisclosure of assets or the improper avoidance of probate. As a result, various meetings were held,

committees appointed, three drafts of a pamphlet made, a further review made especially to determine whether anything was libelous in the pamphlet, and in October, 1966, a pamphlet was approved for publication. The defendant did not make a profit on the pamphlet nor was it motivated by a desire for profit. The pamphlet was purely a public service to explain the procedures and purposes of probate and to expose some of the dangers that could befall someone following the advice in the plaintiff's book. The defendant's pamphlet did not state that the plaintiff intended to advocate the nondisclosure of assets but that it was presumably advocating nondisclosure of assets because that is how a layman would likely interpret the plaintiff's recommendations.[3]

The defendant claims that the court was in error in several rulings on evidence. Paragraph 7 of the complaint alleges: "In further discussing the plaintiff's statements set forth in paragraph 5 above, [referring to the plaintiff's statement concerning joint accounts and safety deposit boxes] and in other portions of plaintiff's book, the defendant's pamphlet at page 17 reads as follows: 'The worst that could happen to the Dacey believer is a term in jail. Some of Dacey's recommendations regarding joint accounts, safe deposit boxes, and certificates of title which lead to a failure to disclose assets could be fraudulent as to creditors, the state and Uncle Sam.' " During the cross-examination of the president of the defendant at the time the pamphlet

---

[3] The offers of proof of both parties were more extensive but the recited facts are sufficient to discuss the claims of error which are dispositive of this appeal. The defendant has attacked three of the plaintiff's offers of proof. As there was evidence tending to prove the existence of the facts in those offers of proof, they remain unchanged. Practice Book § 635, repealed as of October 1, 1974.

was published, its counsel attempted to question him on the plaintiff's recommendations concerning automobile certificates of title.[4] After the plaintiff objected, the court said: "No, I don't read the complaint as having anything to do with the certificates of title," and ruled that the questions were irrelevant. There is no universal test of relevancy. Relevancy must be determined in each case according to the teachings of reason and judicial experience. *Robinson* v. *Faulkner,* 163 Conn. 365, 371, 306 A.2d 857. Such determination requires the exercise of the court's discretion. *State* v. *Blyden,* 165 Conn. 522, 531, 338 A.2d 484; *State* v. *Bassett,* 151 Conn. 547, 551, 200 A.2d 473.

The complaint alleges that the statement in paragraph 7 is one of two libelous statements made in the defendant's pamphlet. Following the plaintiff's advice as to certificates of title is included, in paragraph 7, as one of the reasons a Dacey believer could go to jail. It is mentioned with joint accounts and safe deposit boxes. Further, in a subsequent paragraph, the plaintiff alleges that the "defendant published the statements . . . in paragraphs 6 and 7 [paragraph 6 referring to safe deposit boxes only and paragraph 7 referring to "Dacey believers"]

---

[4] Those recommendations, appearing at p. 237 of the plaintiff's book, are:

"On the back of nearly all automobile registration certificates is a place where you are to sign if you sell the car or turn it in on a new one. Sign it—now. If anything happens to you, your spouse or other family member can take it down to the Motor Vehicle Department and freely transfer it to another name without having to forge any signature or apply to the probate court for 'letters testamentary.' Some states now require possession of a title form in connection with ownership of a motor vehicle, which form must be signed and surrendered to the Motor Vehicle Department when the vehicle is being transferred to someone else. If your state is one requiring a title form, make certain that you sign it now as well as the car registration certificate."

either with knowledge that its said statements were false or with a reckless disregard as to their truth, and said statements of the defendant intentionally and maliciously distort and misstate the true purpose and meaning of the plaintiff's language set forth in paragraph 5 above [paragraph 5 relates to the plaintiff's statements in his book in regard to joint accounts and safe deposit boxes] . . . ." The remaining portion of the allegation refers to safety deposit boxes only. The complaint also alleges that the two statements in the defendant's pamphlet which refer to safe deposit boxes and "Dacey believers" are false and libelous.

Although the complaint stresses that the safe deposit box instructions in the plaintiff's book were not fostering illegal acts, it relies heavily on the claim that the statements referring to "Dacey believers," which include references to certificates of title, were libelous. It is evident that the complaint was framed so that the statements relating to safety deposit boxes in the plaintiff's book would be the issue litigated as far as he was concerned but it is also evident that the plaintiff was relying with great weight on the statements in the defendant's pamphlet relating to "Dacey believers" going to jail which included, as one of the bases for those statements, the plaintiff's instructions relating to certificates of title of motor vehicles. It is noteworthy that the plaintiff brought out that joint accounts and survivorship estates were recommended by attorneys, and the president of the defendant was extensively cross-examined by the plaintiff's counsel in this regard, yet the matter of joint accounts is treated by the plaintiff's complaint in the same manner as certificates of title of motor vehicles. The defendant was entitled to defend the

statements made in its pamphlet and the bases upon which the statement was made as enumerated in the statement itself. "A party cannot, however, be deprived of his right to support his cause by introducing evidence tending to prove facts upon which issue has been joined, if the evidence is not excluded by some rule of law. *Moran* v. *New York, N.H. & H.R. Co.,* 107 Conn. 454, 457, 140 A. 818." *Papa* v. *Youngstrom,* 146 Conn. 37, 40–41, 147 A.2d 494; see *State* v. *Luzzi,* 147 Conn. 40, 47, 156 A.2d 505. The evidence offered was relevant and the court abused its discretion in sustaining the objection.

The plaintiff claimed that his services and income were practically destroyed by the publication of the defendant's pamphlet. During the course of the trial, the defendant offered and the court allowed into evidence six publications of the bar associations in various states and a consumer report magazine. The defendant claimed, among other things, that if the plaintiff suffered general damages then these other publications were at least in part the cause of such damages. See *Hartmann* v. *American News Co.,* 171 F.2d 581, 585–86 (7th Cir.), cert. denied, 337 U.S. 907, 69 S. Ct. 1049, 93 L. Ed. 1719. All of these publications were critical of the plaintiff's book but in addition made pointed and caustic remarks concerning the plaintiff's statements regarding lawyers and probate procedures. Two of the publications referred to a portion of an opinion which was uncomplimentary to the plaintiff in a case decided in this court involving a suit against the plaintiff for the unauthorized practice of law. In rebuttal, the plaintiff offered into evidence a full-page advertisement that he had inserted in a state newspaper giving, in acrimonious language, his opinion of this court concerning the

opinion in the case referred to above. Also included in the advertisement was a denouncement of lawyers and judges written in 1726 by Jonathan Swift in Gulliver's Travels. The exhibit was wholly irrelevant to the issue of whether the defendant had libeled the plaintiff. The dilemma of the presiding judge as is noted in the record is understandable in view of the fact that two of the exhibits mentioned the uncomplimentary remarks made in an opinion of this court and the claim was made that the plaintiff was entitled to rebut such evidence. This situation is a classic example of parties vigorously pursuing wholly collateral matters to a point where the issue in the case is completely overshadowed and ignored. Allowing this exhibit was erroneous as it was in no way relevant to the issue of whether the defendant libeled the plaintiff.

In the bill of exceptions, the plaintiff charges that the court erred in allowing into evidence the six publications which were critical of the plaintiff. The portions of these publications which did not pertain to the criticism of the matters referred to in the defendant's pamphlet were not admissible. This is especially so concerning the repetition of statements made by this court in a case which concerned the unauthorized practice of law and not the matters contained in the plaintiff's book. The objections were general, however, and when the publications were offered as exhibits, the record indicates that the inadmissible portions were not pointed out to the court. If any portion of an exhibit is admissible, then a general objection is not sufficient. It is incumbent upon a party to point out the inadmissible parts with specificity and to give reasons why the specific parts are not admissible. The court was not in error in admitting the

six publications. It had no duty to separate the inadmissible parts of the publications from the admissible parts. *State* v. *Palozie,* 165 Conn. 288, 296, 334 A.2d 468; *Mucci* v. *LeMonte,* 157 Conn. 566, 570, 254 A.2d 879.

The defendant claims that the court erred by refusing to charge the jury that the plaintiff must prove actual malice with convincing clarity. Instead, the court charged that the plaintiff must prove actual malice by a fair preponderance of the evidence.

The burden of persuasion in an ordinary civil action is sustained if evidence "induces in the mind of the trier a reasonable belief that it is more probable than otherwise that the fact in issue is true." *Darrow* v. *Fleischner,* 117 Conn. 518, 520, 169 A. 197; *Mead* v. *Husted,* 52 Conn. 53, 56–61. In certain extraordinary circumstances a higher degree of belief has been required. So, in *Busker* v. *United Illuminating Co.,* 156 Conn. 456, 458, 242 A.2d 708, we noted that fraud must be "strictly proven by clear, precise and unequivocal evidence"; in *Girden* v. *Alubowicz,* 136 Conn. 511, 513, 72 A.2d 491, that interference with title to real property by estoppel in derogation of record title must be proved by "clear and definite evidence"; in *Bell* v. *Bloom,* 146 Conn. 307, 309, 150 A.2d 300, that a party who asserts the nondelivery of a deed must prove it by "clear and convincing evidence"; and in *Graybill* v. *Plant,* 138 Conn. 397, 400, 85 A.2d 238, that a claim for compensation for services from the estate of a decedent over and above that already received may be established only upon "clear and satisfactory proof." Similarly, in those cases where a public official or public figure seeks recovery for injury

to reputation a higher degree of belief in the existence of actual malice has been required. *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789.

The United States Supreme Court, in *New York Times Co.* v. *Sullivan,* 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686, recognized that to avoid the "risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press" some modifications in the law of libel and slander were necessary. *Gertz* v. *Robert Welch, Inc.,* supra, 340. The problem for the court was to resolve the tension between first amendment rights and the legitimate state interest in redressing injury to reputation. *Gertz* v. *Robert Welch, Inc.,* supra, 342. Part of the solution, as to the recovery by public officials and public figures from their critics for injuries caused by libel, required proof that the defamatory falsehood was published with "actual malice." Actual malice was defined as knowledge that the statement was false or reckless disregard of whether it was false or not. *New York Times Co.* v. *Sullivan,* supra, 279–80. The definition supports the central theme in this area: the United States constitution delimits a state's power to award damages for libel in actions brought by public officials and public figures against their critics. *Curtis Publishing Co.* v. *Butts,* 388 U.S. 130, 162–63, 87 S. Ct. 1975, 18 L. Ed. 2d 1094; *New York Times Co.* v. *Sullivan,* supra, 283.

The evidence adduced to prove actual malice must do so with "convincing clarity." *New York Times Co.* v. *Sullivan,* supra, 285–86. The degree of belief conveyed by the words "convincing clarity" has been restated as "clear and convincing proof." *Gertz*

v. *Robert Welch, Inc.,* supra; *Rosenbloom* v. *Metromedia, Inc.,* 403 U.S. 29, 30, 91 S. Ct. 1811, 29 L. Ed. 2d 296. The plaintiff asserts that this standard is only to be used by the appellate court in reviewing the evidence presented at the trial court. The standard of "clear and convincing proof" is to be applied, however, by the trier of fact to determine whether the defamatory falsehood was made with knowledge of its falsity or with reckless disregard of the truth. *Gertz* v. *Robert Welch, Inc.,* supra; *Rosenbloom* v. *Metromedia, Inc.,* supra; *Alioto* v. *Cowles Communications, Inc.,* 519 F.2d 777, 779–80 (9th Cir.), cert. denied, 423 U.S. 930, 96 S. Ct. 280, 46 L. Ed. 2d 259; *Guam Federation of Teachers* v. *Ysrael,* 492 F.2d 438, 441 (9th Cir.), cert. denied, 419 U.S. 872, 95 S. Ct. 132, 42 L. Ed. 2d 111; *Carey* v. *Hume,* 390 F. Sup. 1026 (D. D.C.); *Montandon* v. *Triangle Publications, Inc.,* 45 Cal. App. 3d 938, 120 Cal. Rptr. 186, cert. denied, 423 U.S. 893, 96 S. Ct. 193, 46 L. Ed. 2d 126; *Field Research Corporation* v. *Patrick,* 30 Cal. App. 3d 603, 608, 106 Cal. Rptr. 473, cert. denied, 414 U.S. 922, 94 S. Ct. 218, 38 L. Ed. 2d 157; *Stone* v. *Essex County Newspapers, Inc.,* Mass. , 330 N.E.2d 161; contra, *Corabi* v. *Curtis Publishing Co.,* 441 Pa. 432, 456–57, 273 A.2d 899. "The rule comports with reason, for who but the trier of fact should, at least initially, apply the rules upon which liability for defamation is predicated." *Field Research Corporation* v. *Patrick,* supra. The court erred, therefore, by refusing to charge that actual malice must be proved with "convincing clarity" or, as it is restated, with "clear and convincing proof."

The phrase "clear and convincing proof" denotes a degree of belief that lies between the belief that is required to find the truth or existence of the

issuable fact in an ordinary civil action and the belief that is required to find guilt in a criminal prosecution. One court has suggested that "clear and convincing proof" is "strong, positive, free from doubt," and "full, clear and decisive." *Stone* v. *Essex County Newspapers, Inc.,* supra. Those phrases tend to distinguish the applicable burden of persuasion from others but they also tend to focus on the nature of the evidence rather than on the trier's state of mind. For this reason the burden of persuasion should be phrased in a manner similar to the way in which the burden for an ordinary civil action was expressed in *Darrow* v. *Fleischner,* 117 Conn. 518, 520, 169 A. 197. The burden of persuasion, therefore, in those cases requiring a showing of clear and convincing proof is sustained if evidence induces in the mind of the trier a reasonable belief that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist.[5] See Morgan, Some Problems of Proof Under the Anglo-American System of Litigation, 84–85; McBaine, "Burden of Proof: Degrees of Belief," 32 Cal. L. Rev. 242,

---

[5] This standard was taken, in substantial part, from Professor McBaine's "Burden of Proof: Degrees of Belief," 32 Cal. L. Rev. 242. In his article he amplifies the standard in the following portion of a suggested jury charge (pp. 263–64): "The burden [of persuasion] is not a burden of convincing you that the facts which are asserted are certainly true or that they are almost certainly true, or are true beyond a reasonable doubt. It is, however, greater than a burden of convincing you that the facts are more probably true than false. The burden imposed is to convince you that the facts asserted are highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist. If then you believe upon consideration and comparison of all the evidence in the case that there is a high degree of probability that the facts are true you must find that the fact[s] have been proved."

246, 263–64; Morgan, "Instructing the Jury Upon Presumptions and Burden of Proof," 47 Harv. L. Rev. 59, 66.

The defendant claims the court erred in denying its motion to set aside the verdict and for judgment notwithstanding the verdict. It claims that the statements, which were limited, were true as made. Truth is a defense in a civil action for libel. *Bartlett* v. *Flaherty,* 155 Conn. 203, 205, 230 A.2d 436; *Johnson* v. *Whipple,* 117 Conn. 599, 601, 169 A. 619; see *Cox Broadcast Corporation* v. *Cohn,* 420 U.S. 469, 489–90, 95 S. Ct. 1029, 43 L. Ed. 2d 328. The defendant claims that the plaintiff's recommendations concerning safe deposit boxes and joint accounts could lead to a nondisclosure of assets because the surviving spouse could be led thereby to avoid probate by not disclosing those assets of the decedent that were placed in the surviving spouse's box or were in the transferred funds. The defendant says this is especially probable because the recommendations are in a book entitled "How to Avoid Probate!" and in a chapter entitled "Ways of Avoiding Probate." The defendant also claims that the plaintiff's recommendation concerning automobile registration certificates could result in perjury, forgery and conspiracy.

The complaint alleges that the purpose of using separate safe deposit boxes was to give the surviving spouse quick access to the decedent's important documents, such as wills, deeds, and insurance policies, that the plaintiff needs without waiting for the wheels of probate to start meshing and rolling. The evidence does not show that the plaintiff's book affirmatively, or specifically, advocates the nondisclosure of assets or the nonpayment of taxes.

The plaintiff's book states that heirs should be instructed to compute carefully any taxes due and to pay them to the appropriate state authority. Whether the natural consequence of one reading the plaintiff's book would be the nondisclosure of assets or the avoidance of paying taxes legally due was a question for the jury, and the court was not in error in refusing to set the verdict aside on the ground that the statements made were true. As to the claims of the defendant concerning the automobile certificates of title, the defendant's evidence was not allowed on this issue. No determination can be made until both parties have the opportunity to present evidence on this issue.

A further ground asserted in the defendant's motion at the trial was that the verdict was against the evidence in that the plaintiff did not prove actual malice with convincing clarity as a matter of law. The court's denial is tested by the evidence printed in the appendices to the briefs. *Moriarty* v. *Lippe,* 162 Conn. 371, 374, 294 A.2d 326. That evidence is substantially the same as the claims of proof given in the text above. It must appear that the evidence furnished no reasonable basis for the jury's verdict. The evidence must be considered in the light most favorable to the plaintiff. *Moriarty* v. *Lippe,* supra. The question is whether the defendant knew of the falsity of its statements or recklessly disregarded whether they were false. The reckless conduct required by *New York Times* "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth

or falsity and demonstrates actual malice." *St. Amant* v. *Thompson,* 390 U.S. 727, 731, 88 S. Ct. 1323, 20 L. Ed. 2d 262.

In determining whether there was sufficient evidence to show actual malice, we are mindful that litigants have a constitutional right to have issues of fact determined by the jury. *Desmarais* v. *Pinto,* 147 Conn. 109, 110, 157 A.2d 596. And so the credibility of the witnesses and the weight to be accorded their testimony is a matter for the jury to decide. Further, we refrain from choosing among inferences as this is another jury function. *Johnson* v. *Flammia,* 169 Conn. 491, 496, 363 A.2d 1048; see also *Guam Federation of Teachers* v. *Ysrael,* 492 F.2d 438, 441 (9th Cir.); *Alioto* v. *Cowles Communications, Inc.,* 519 F.2d 777, 780 (9th Cir.).

Making all decisions as to credibility and drawing all inferences in favor of the plaintiff, we cannot hold that the jury could not believe, as a matter of law, to the extent required by the burden of clear and convincing proof, that the defendant published its pamphlet with actual malice.

In view of the fact that a new trial is required, the remaining assignments of error need not be considered.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.